FOURTH DIVISION

February 22, 2001

No. 1-99-4079

TERRY L. HASEK, ALAN BLOCK, ) Appeal from the

and MITCHELL E. BIANCHIN, ) Circuit
 Court of

Individually and On Behalf of All Others
 ) Cook County
.

Similarly Situated, )

)

Plaintiffs-Appellants, ) 

)

v. )

)

DAIMLERCHRYSLER CORPORATION, ) The Honorable 

) Thomas P. Durkin,

) Judge Presiding.

Defendant-Appellee. )

)

JUSTICE SOUTH delivered the opinion of the court:

Terry Hasek, individually and on behalf of all others similarly situated, brought this class action against DaimlerChrysler Corporation (Chrysler).  In their original complaint, plaintiffs alleged that Chrysler's model years 1991-95 Jeep vehicles with 4.0 liter (4.0L) and 2.5 liter (2.5L) engines were defective due to an idle knocking noise in the engine.
(footnote: 1)  The original complaint contained four counts:  count I was based on the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 
et seq
. (West 1998);  count II was based upon common law fraud; count III was based upon breach of implied warranty of merchantability;  and count IV was based upon a breach of express warranty.  
Plaintiffs requested a judgment requiring Chrysler to repair or adjust their engines, or pay the dollar amount of such repair or adjustment, or refund the cost of their warranties.

Plaintiffs filed a second amended complaint, in which Alan Block and Mitchell Bianchin joined as additional class representatives.  The trial court granted plaintiffs leave to file their fifth amended complaint and dismissed the class-wide claims for breach of implied warranty of merchantability and the individual claims of Hasek, Block, and Bianchin for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act with prejudice.

In their fifth amended complaint, plaintiffs alleged that Chrysler breached its warranty under the Uniform Commercial Code (UCC) (810 ILCS 5/1-101 
et seq
. (West 1998)) (count I), and under the Magnuson-Moss Warranty Act (15 U.S.C. §2301 
et seq
. (1994)) (count II), and committed common law fraud (count III).

Hasek, the leading class representative, purchased a new 1994 Grand Cherokee with a 4.0L engine in the fall of 1993.  In the spring of 1994, he noticed a knocking sound coming from the engine.  He took his vehicle to Libertyville Jeep/Eagle where a mechanic listened to it and stated that he recognized the sound as a piston knock.  He subsequently took his vehicle to three other Jeep dealers to try and fix the idle knocking noise.  

Hasek also took his vehicle to the Kenosha engine plant where he spoke to Robert Hollingsworth, the manufacturing/production manager, and Charles Beffel, the quality and engineering manager.  He expressed that the noise had become so bothersome that he wanted to trade the car in for an eight-cylinder model.  Hollingsworth and Beffel told Hasek that they were familiar with the idle knocking sound, and that although Chrysler had been working to resolve the issue, there had been no resolution thus far.  They both listened to Hasek's Jeep and confirmed that it did have a knocking sound at idle.  Hasek testified that two additional Chrysler representatives listened to his Jeep prior to trial and agreed that it had a knocking sound.  He also testified that although he paid for his repair warranty when he purchased his vehicle, he did not receive the benefit of the warranty because Chrysler never fixed the idle knocking noise in his Jeep and it never contacted him about the engine noise problem.  It was also established at trial that when the dealers requested that Hasek leave his vehicle overnight to be serviced, he refused.

Plaintiffs Block and Bianchin also testified at trial that they had similar experiences with their 1991-95 4.0L Jeeps.  Chrysler representatives listened to their Jeeps at idle and confirmed that there was a slight knocking noise.  Block, Bianchin and other class members expressed concern that there could be engine reliability and durability problems upon noticing a diesel-like engine noise, which was uncharacteristic for a spark engine ignition.  They testified that they also sought a repair of adjustment under the repair warranty, but Chrysler did not fix the engine noise.  Some class members did receive replacement engines under the repair warranty.  However, some testified that the replacement engines also had this idle knocking sound.

Chrysler acknowledged that there were customer complaints.  According to Chrysler's records, of the 1,155,993 Jeeps sold between 1991-95, the number of customers who complained about any type of engine noise was 12,807 or 1.11%.  They received over 400,000 customer complaints 
during that period of time.  However, only 3.2% of these complaints were about engine noise.  In response to these complaints, Chrysler decided to investigate the source of the noise and created several task forces to determine the source of the problem.

The investigation determined that there were three issues concerning the production of the 4.0L engines:  (1) mismatched pistons, (2) flaking molykote coating on the pistons and (3) an increased torque of the cylinder head bolt.  In late 1993, Chrysler realized
 that one of the electronic gauges that measures cylinder bore diameters at the Kenosha plant malfunctioned and did not work properly for 7 to 10 days.  As a result, some of the pistons were mismatched to their bores even though the pistons were still within specification.  After the electronic gauge was repaired, the malfunction was corrected.

Also, in the spring and summer of 1994, a subcontractor misapplied molykote
(footnote: 2) coating to the head of the pistons.  Apparently, he failed to clean the piston heads properly before applying the molykote coating.  Therefore, the coating flaked off more readily.  This batch of pistons was identified and returned to the subcontractor, who subsequently removed the molykote and improved his washing process.  Chrysler issued a technical service bulletin (TSB) concerning these issues in April 1994.

During 1993 and 1994, Chrysler created an "Idle Knock Task Force" and a "Diesel Noise Task Force" to address customer complaints about the engine noises.  Chrysler also had an ongoing task force known as the "noise, vibration, and harshness task force" (NVH) that studied and recommended improvements for overall engine sound quality.  NVH recommended that, in order to reduce sound radiation in the 4.0L engine, a main bearing brace could be added to the bottom of the engine block.  NVH indicated that by tying the main bearing caps together, bearing movement is kept at a minimum and sound is reduced.  This change was incorporated in the 1996 models.

A "customer response team" was also created to respond to customer dissatisfaction, predominantly dealing with the 1993-95 models.  Chrysler had the team contact more than 12,000 customers who complained of the engine noise to assure them that there was no durability or safety issue.  These customers were offered several options:  (a) engine replacement;  (b) a service contract;  or (c) a coupon for discounted purchase of parts or services.  Out of the more than 12,000 customers contacted, 30% were satisfied with their Jeeps and kept their engines; approximately half chose an engine replacement;  18% to19% chose service contracts;  2% chose the coupons; and the remainder traded into other Chrysler products.  Chrysler contacted several thousand of the customers who chose the replacement engines within 30 days and, of those surveyed, 90% were "very satisfied" with the replacements, and those that were not satisfied were given yet other engine replacements.  

Four experts testified at trial: Dr. Richard Lyon, Dr. Thomas Asmus, Dr. Phillip Myers and Dr. Larry Erickson.

Dr. Lyon, a professor in the mechanical engineering department at the Massachusetts Institute of Technology, who taught courses in sound quality, machinery noise and diagnostics, sound and structural vibration, transportation noise and acoustics, testified as an expert on behalf of the class.  He testified that based upon Chrysler documents he reviewed regarding the engineering history of the 4.0L engines:  (1) the idle knock/diesel noise started with the 1991 high output engine, (2) the noise was caused by unusually strong piston slap at about 45° before the top dead center, and (3) the source of the unusual piston slap was excessive bore distortion caused by an insufficiently rigid block.  Lyon tested his conclusions by conducting vibration testing on 1991, 1992, 1993
 and 1995 4.0L model vehicles purchased by class counsel at an automobile auction.

Dr. Asmus, a senior research executive at Chrysler, engages in engine research.  He testified on behalf of defendant regarding the "piston slap," which occurs in all four-stroke engines as a result of the forces acting upon the piston.  He explained that there are several types of piston slaps.  One is the "conventional" piston slap, which refers to the lateral movement of the piston from one side of the cylinder liner to the other.  Conventional piston slap causes the most concern to engineers because at this point the oil film which protects the piston from the cylinder liner is relatively hot, oil viscosity is relatively low, and the gas pressure force in the chamber is high.  Furthermore, the gas force on top of the piston slap is very high, and the cylinder liner at the point of impact is very hot.  Asmus explained that conventional piston slap is most audible under a heavy load when gas pressures are high and cylinder piston temperatures are elevated.

Another type of piston slap is "early" piston slap, which occurs at approximately 45°
 to 50° before top dead center during the crank shaft rotation when the cylinder pressure changes from negative to positive.  Asmus testified that, unlike conventional piston slap, early piston slap during idle is not a concern to engineers because the forces involved are very low and the gas pressure forces are low.  He opined that the oil is more robust and thicker, thereby allowing the piston to be cushioned during the impact.  Although early piston slap does exist in all throttle spark engines, it may or may not be audible because the audibility depends on the nature of the translation and other sounds that may be emanating from the engine structure.

He further testified that a throttle spark engine is not defective because it exhibits a conventional or early piston slap at idle, nor is it defective because there is an audible conventional or early piston slap at idle.  He stated that the audibility of a piston slap is very subjective and is one of the many things about an engine that is audible.  He explained that attempting to reduce the audibility of the piston slap subjects the engine to great risks of serious failure.

Asmus testified that although attaching a main bearing brace to the bottom side of the 4.0L engine is a common remedy for what is called a crank rap or bottom end noise, it will have no impact whatsoever on the impact of the piston slap, which occurs in the upper portion of the engine block.

Asmus concluded that, based upon his experience, audible conventional or early piston slap is not the result of any defect in material, factory preparation or workmanship.

Dr. Myers, professor emeritus at the University of Wisconsin in the mechanical engineering department, testified on behalf of defendant that all engines make sounds because "it is the nature of the beast."  He also testified about piston slap and stated that the clearance between the piston and the bore is a design consideration.  On one hand, too small a clearance can cause engine seizures.  On the other hand, too large a clearance can be a problem because of oil consumption.  Myers stated that since Jeeps are designed specifically for heavy use, they need  larger piston-to-bore clearances.

Myers inspected a 1992 Jeep with 84,629 miles and noticed a slight tapping sound, which he characterized as excess clearance in the valve train.  He also inspected a 1991 Jeep with 99,750 miles, which had a whirring sound that he did not equate with piston slap.  Finally, he inspected a 1995 Jeep with 51,235 miles, which had a fan-like noise.

Myers found no evidence that piston slap of any kind in the 4.0L engine created any performance, reliability or resale issues in the 1991-95 Jeep vehicles.  He concluded that the existence of an audible piston slap is not a defect in material, factory preparation or workmanship, and that there was no way to completely eliminate piston slap without adversely affecting the durability of the engine.

Dr. Eriksson, co-owner of Eriksson Research LLC, an acoustical engineering consulting and management company, also testified on defendant's behalf.  He described the sound in the engine as a propagating pressure fluctuation in the air.  Based upon his experience, he did not think that sound, in and of itself, can be a defect because it is too subjective.  He explained that a sound that some considered as "uncharacteristic" cannot be a defect because the term is, itself, subjective and does not necessarily mean that the sound is unpleasant.  He opined that, in the noise control area, many noise control solutions may affect the long-term reliability of a product.  As such, design compromises are required to integrate these changes.

Eriksson listened to, inspected and operated the three auction vehicles purchased by the class, three plaintiffs' vehicles, and the 1996 Jeep owned by Bianchin.  He also listened to binaural recordings taken inside and in front of all the vehicles, and he did not hear any sound that he considered to be distinctive or uncharacteristic or that could cause concern or annoyance to a customer.  He considered the sounds perfectly normal.  Eriksson also drove the vehicles for a short distance and concluded that they sounded very reasonable.

Eriksson concluded that a product is not defective if it is able to perform in a manner that reasonably resembles the performance of similar products.  He did not believe that the vehicles he inspected were defective because all of them had very high mileage and, in many cases, were still owned by the original purchaser.

Herbert Walter, a partner at the firm of Price Waterhouse Coopers who focuses on financial analysis and transactions in the automotive industry, also testified at trial on defendant's behalf.  He was asked to evaluate whether plaintiffs suffered any financial damages as a result of the noise in the 4.0L engine.  Walter found that the 1991-95 Jeep vehicles actually sold at a higher rate than their competitors and maintained their post-sale values at least as well as competing products.

During the course of the trial, the trial judge personally inspected and listened to the Jeep vehicles owned by the class representatives.  He also examined and listened to the three Jeep auction vehicles purchased by the class plaintiffs at an auction.

At the conclusion of all the evidence, the court held that plaintiffs had not met their burden of proof and entered judgment in favor of Chrysler on all counts.  Plaintiffs have filed a timely appeal based upon the breach of express warranty counts under the UCC and Magnuson-Moss Warranty Act only.

A court of review will not substitute its own opinion and disturb the findings of the trial court unless the trial court's ruling following a bench trial is manifestly against the weight of the evidence.  
Herst v. Clark
, 219 Ill. App. 3d 690, 692, 579 N.E.2d 990, 991 (1991).  The appellate court is required to review the entire record as a whole, considering all evidence in favor of the appellee.  
Herst
, 219 Ill. App. 3d at 692, 579 N.E.2d at 991.  Since the trial judge is in the best position to weigh the evidence and evaluate the expert testimony, as a reviewing court we will not 
substitute our judgment as to the credibility of witnesses for that of the 
trial court.  
Stanton v. Republic Bank
, 144 Ill. 2d 472, 479, 581 N.E.2d 678, 681 (1991)
.

Plaintiffs argue that the trial court's findings were against the manifest weight of the evidence because their testimony and the testimony of their expert established that Chrysler breached its express warranty.  They argue that the evidence at trial clearly showed that:  (1) the 1991-95 model years 4.0L Jeep engines exhibited an 
uncharacteristic sound
 that legitimately caused consumers to be concerned about engine reliability and durability problems;  (2) the idle knock sound was caused by unusually strong piston to bore impacts which, in turn, are primarily caused by a 
defective engine block
;  (3) Chrysler warranted that it would repair
 all defects
 in material, workmanship or factory preparation in 1991-95 model years 4.0L Jeep engines;  (4) Chrysler had notice of the 
defect
, but did not cure it;  and (5) they were damaged as a result.  Based upon these established facts, plaintiffs assert, the trial court's finding in favor of Chrysler was against the manifest weight of the evidence.

Chrysler responds that the testimony of their experts at trial established that plaintiffs' vehicles were not defective in materials, workmanship or factory preparation.  They argue that an "engine noise," in and of itself, does not constitute a 
defect
.  Furthermore, based upon case law, warranty claims based upon "engine noise" alone have been universally rejected.  As such, the trial court's determination that there was no breach of warranty in this case was not against the manifest weight of the evidence.

In a breach of express warranty action under the UCC, plaintiff must show a breach of an affirmation of fact or promise that was made a part of the basis of the bargain.  
Wheeler v. Sunbelt Tool Co.
, 181 Ill. App. 3d 1088, 1100, 537 N.E.2d 1332, 1341 (1989); 810 ILCS 5/2-313 (West 1994)
.  Since express warranties are contractual in nature,
 the language of the warranty itself is what controls and dictates the obligations and rights of the various parties.  
Wheeler
, 181 Ill. App. 3d at 1100, 537 N.E.2d at 1341.

In this case, it is undisputed that an express warranty existed.  The warranty provides:  "During the terms of the Limited Warranties on your vehicle, Chrysler covers the cost of all parts and labor needed to repair or adjust any Chrysler supplied item (except tires and OKI Cellular Telephone) that proves defective in material, workmanship or factory preparation."  The warranty further states:  "All of the Chrysler Limited Warranties stated in this book are the only express warranties made by Chrysler applicable to the vehicle."  Therefore, plaintiffs' burden at trial was to prove that the "engine noise" was caused by a 
defect 
in material, workmanship or factory preparation.  Additionally, if in fact there was a defect, plaintiffs also had to
 prove that Chrysler breached its promise to repair or replace the defective parts under the UCC.  
Collum v. Fred Tuch Buick
, 6 Ill. App. 3d 317, 322, 285 N.E.2d 532, 536 (1972) (in order to recover under a breach of express warranty, plaintiff must prove that the alleged malfunctioning
 of the car was caused by a defect in the parts or workmanship and that the manufacturer failed to repair or replace the parts in accordance with the warranty).

At trial, the class plaintiffs' expert, Lyons, testified that based upon his review of the documents tendered by Chrysler, the idle knock/diesel noise was caused by an "unusually strong piston slap" and that the cause of the unusual piston slap was an excessive bore distortion caused by an insufficiently rigid block.  He stated that he conducted vibration and frequency testing on several 4.0L engines to confirm his conclusions.  In his opinion, the idle knock/diesel noise is a "sound defect" because "it's a sound due to a piston slap that just simply should not be audible in a spark-ignition engine (internal combustion engines)." 

On cross-examination, however, Lyons verified that sound and whether or not a sound is annoying are context dependent.  He also testified that he had not conducted the traditional sound testings on any of these automobiles.
(footnote: 3)
 Lyons testified that he only conducted vibration testing on the vehicles by placing two microphones approximately one foot above the engine and one foot below the engine.    Although this test recorded a knocking noise in the engine, 
Lyons stated that these tests were conducted with the Jeep hood open, instead of closed, and that there were no tests conducted from inside the vehicle, where the driver or passenger normally sits.  

He also opined that, in order to measure vibrations within an internal combustion engine, such as the 4.0L engine, you must know when the spark occurs in the cylinder, and Lyons simply did an estimate as to when this occurred in the Jeep.  Although it was his opinion that the audible piston slap was most forceful at 45°, he did not conduct any measurements to confirm this fact.  

Finally, he stated that he was not certain whether this piston slap results in engine damage.  
Although he did testify that in his opinion this "diesel-like knocking noise" was the result of a 
design defect
, he never testified that this noise was indicative of a defect in materials, workmanship or factory preparation.

Asmus testified that there are several types of piston slap.  Conventional piston slap causes the most concern to engineers and is most likely to be audible under heavy loads when gas pressure is high and cylinder piston temperatures are elevated.  Early piston slap occurs at approximately 45°
 to 50° before top dead center, when the cylinder pressure changes from negative to positive.  Unlike conventional piston slap, early piston slap is not a concern to engineers because the forces involved, including gas pressure, are very low.  He opined that, although early piston slap exists in all throttle spark engines, it may or may not be audible.  He further testified that a throttle spark engine is not defective merely because it exhibits an audible conventional of early piston slap at idle and that it is not the result of any defect in material, factory preparation or workmanship.  Finally, Asmus stated that attempting to reduce the piston slap in the 1991-95 vehicles could subject the engine to great risks of serious failure.

Myers explained that engine sounds are inherent in the "nature of the beast."  He stated that after inspecting three of the Jeep vehicles ∼ a 1992 Jeep with 84,629 miles, a 1991 Jeep with 99,750 miles and a 1995 Jeep with 51,235 miles ∼ none of them exhibited an engine noise that could be associated with a piston slap.  Furthermore, he found no evidence that piston slap in the 4.0L engine created any performance, reliability or resale issues in the 1991-95 Jeep vehicles.  Myers opined that the existence of an audible piston slap did not create a defect in material, factory preparation or workmanship, and that there was no way to completely eliminate piston slap without adversely affecting the durability of the engine.

Erickson testified that, based upon his experience, an "uncharacteristic" sound, in and of itself, cannot be a defect because it is too subjective.  He opined that many noise control solutions may affect the long-term reliability of a product.  Therefore, design compromises are often required.

Erickson listened to, inspected and operated three auction vehicles purchased by the class, three of plaintiffs' vehicles, and the 1996 vehicle owned by Bianchin.  He also listened to recordings taken inside and in front of all of these vehicles, and he did not hear any sound that was "uncharacteristic" or that should cause concern.  He opined that the vehicles he inspected were not defective.  All of them had very high mileage and, in many cases, were still owned by the original owners.

Walter also testified on behalf of Chrysler.  He stated that the 1991-95 Jeeps actually sold at a higher rate than their competitors and maintained their post-sale values at least as well as their competitors.  

Based upon the expert testimony, standing alone, the trial court's determination, that the class plaintiffs had not met their burden of proving that there was a 
defect in material, workmanship nor factory preparation
 in the 4.0L Jeep engines, was not against the manifest weight of the evidence.  

None of the experts, including plaintiffs' expert, testified that as a result of this noise the 4.0L Jeep engines were defective in material, workmanship or design.  Lyons did not conduct any testing from inside the vehicle, he did not sit inside the Jeep and listen to it during idle, and he did not test drive any of the vehicles.  Plaintiffs testified that although there was 
concern 
regarding the reliability and durability of the vehicles, none of the vehicles exhibited any reliability and durability problems.

An express warranty is contractual in nature; therefore, it must be interpreted in a manner that is consistent with the clear and express language contained therein.  
Illinois Valley Asphalt, Inc. v. La Salle National Bank
, 54 Ill. App. 3d 317, 320-21, 369 N.E.2d 525, 528-29 (1977).
 
 A 
defect
 is defined as "[t]he absence of something necessary for completeness or perfection; a deficiency in something essential to the proper use for the purpose for which a thing is to be used."  Black's Law Dictionary 418 (6
th ed. 1990).  In addition to the expert testimony, 
by definition this "uncharacteristic sound" does not constitute a 
defect
.

Additionally, although our review of this issue is whether the trial court's determination was against the 
manifest weight of the evidence
 presented at trial, case law also supports Chrysler's position.  Precedent that deals with breach of express warranty claims uniformly rejects causes of action based solely upon "engine noise."

In 
Tokar v. Crestwood Imports, Inc
., 177 Ill. App. 3d 422, 532 N.E.2d 382 (1988), a buyer of an allegedly defective automobile sued the automobile manufacturer and dealer for breach of express and implied warranties under both the Magnuson-Moss Warranty Act and the UCC.  One of plaintiff's allegations was that defendant had breached its express warranty because of a "grinding noise in the transmission."  
Tokar
, 177 Ill. App. 3d at 435, 532 N.E.2d at 391.  Very similar to the warranty in the case at bar, the express warranty in 
Tokar
 covered the repair and replacement of "defects in material or workmanship."  
Tokar
, 177 Ill. App. 3d at 425, 532 N.E.2d at 384.  Plaintiff's expert testified that the most logical cause of the grinding noises in the transmission was a problem with the synchronizers.  Plaintiff asserted that this testimony, coupled with his own testimony, was 
prima facie
 evidence that there was a breach of warranty.  
Tokar
, 177 Ill. App. 3d at 435, 532 N.E.2d at 391.  The trial court disagreed with plaintiff and granted a directed verdict in favor of the manufacturer and the jury entered judgment in favor of the dealer.  
Tokar
, 177 Ill. App. 3d at 425, 532 N.E.2d at 384.

We agreed with the trial court and held that plaintiff's evidence, including the testimony of his expert witness, failed to establish that the grinding noise in the transmission was a defect in the automobile that constituted a breach of express warranty to repair or replace defective parts.  
Tokar
, 177 Ill. App. 3d at 436, 532 N.E.2d at 391.
  We reasoned that plaintiff's evidence, including that of his expert, failed to establish that a cause of the grinding noise was a defect in his auto which Subaru failed to remedy or which rendered the car unfit for the ordinary purpose for which autos are used.  
Tokar
, 177 Ill. App. 3d at 436, 532 N.E.2d at 391.

In 
Collum
, plaintiff brought an action against the manufacturer and seller of his Buick vehicle to recover the purchase price of the new automobile.  
Collum
, 6 Ill. App. 3d at 318, 285 N.E.2d at 533
.  Plaintiff argued that, among other things, there was a "squeaky" noise in the motor, which grew louder as the speed increased.  
Collum
, 6 Ill. App. 3d at 319, 285 N.E.2d at 534
.
  He argued that General Motors had breached its express warranty that the car would be free from defects in material or workmanship.  
Collum
, 6 Ill. App. 3d at 322, 285 N.E.2d at 536
.
  The trial court entered judgment for defendants at the close of the buyer's case.  
Collum
, 6 Ill. App. 3d at 321, 285 N.E.2d at 535.

On appeal, we held that, in order to recover on a theory of breach of express warranty, plaintiff must prove that the alleged malfunctioning of the case was caused by a defect in the parts and workmanship, and that the manufacturer failed to repair or replace the parts in accordance with the warranty.  
Collum
, 6 Ill. App. 3d at 322, 285 N.E.2d at 536
.
  The evidence at trial did not prove that the alleged malfunctioning resulted from defective parts or workmanship and "the mere fact that the car made noises *** is not proof that these difficulties were caused by defects in material or workmanship."  
Collum
, 6 Ill. App. 3d at 322, 285 N.E.2d at 536
.

Although in this case plaintiffs' attempt at proving their case was significantly greater than the attempt of the plaintiff in 
Collum
, both 
Tokar
 and 
Collum
 stand for the proposition that noise emanating from the engine, without any indication of a defect, is not enough to establish a breach of express warranty.  Similar to 
Tokar
, in this case, the testimony of the plaintiffs, as well as the testimony of plaintiffs' expert, did not establish a breach of an affirmation of fact that was the basis of the bargain,
 i.e.
, that there was a defect in the 4.0L Jeep engine.  We also note that although plaintiffs did successfully plead a 
prima facie
 case for breach of express warranty, as the trial court correctly noted, they were also faced with the burden of proving that Chrysler actually breached the terms contained in the warranty.  
In a suit for damages for breach of a written express warranty, the burden of proof is on the plaintiff to show by a preponderance of the evidence the terms of the warranty, the failure of some warranted part, a demand upon the defendant to perform under the terms of the warranty, a failure of the defendant to do so, a compliance with the terms of the warranty by the plaintiff, and damages measured by the terms of the warranty.  
Haas v. Buick Motor Division of General Motors Corp.
, 20 Ill. App. 2d 448, 156 N.E.2d 263 (1959).

No plaintiff in this case has ever testified that, as a result of this sound, his Jeep has failed in its essential purpose or that it has posed an unreasonable danger.
  The class plaintiffs' assertion that this noise caused concern and was an inconvenience is not compensable at law.  See 
McGrady v. Chrysler Motors Corp.
, 46 Ill. App. 3d 136, 140, 360 N.E.2d 818, 821 (1977) (inconvenience, without more, is not compensable).

Furthermore, although there was no breach, Chrysler still attempted to keep its customers satisfied by giving them options to remedy the noise.  Out of 1,155,993 4.0L Jeeps sold between 1991-95, 1.11% of the customers complained about an engine noise.  Out of that 1.11%, 30% were so satisfied with the Jeep's reliability, performance and longevity they elected not to do anything to change the vehicle.  Chrysler gave the other 70% a choice of either an engine replacement, a service contract, or a coupon for discounted parts and services.  Out of that 70%, 90% stated that they were very satisfied with the replacement.  As such, although the noise complained of was not a defect that would trigger the warranty, Chrysler attempted to keep its customers satisfied by presenting a remedy to the problem.

Plaintiffs' second issue is whether the trial court erroneously concluded that plaintiffs failed to meet their burden of proof on the Magnuson-Moss Warranty Act.

The Act provides a private right of action by a consumer purchaser of a consumer product against a manufacturer or retailer failing to comply with the Act or the terms of a written warranty arising therefrom.  15 U.S.C. §2310(d)(1) (1994).  The Act was adopted "[i]n order to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products."  15 U.S.C. §2302(a) (1994).

Under the Act, a written warranty is:

"(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking."  15 U.S.C. §2301(6)(A), (6)(B) (1994).

For purposes of establishing a cause of action for breach of express warranty under the Act, as opposed to the UCC, the primary distinction is that under the UCC the express warranty may be oral or may be created by description, sample, or model.  810 ILCS 5/2-313(b), (c) (West 1994).  However, under the Act, the express warranty must be in writing.

Under the Act, a "warrantor" is any supplier or other person who gives a written warranty or who is or may be obligated under an implied warranty.  15 U.S.C. §2301(5) (1994).  A "consumer product" is "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes."  15 U.S.C. §2301(1) (1994).  This includes automobiles. 16 C.F.R. §700.1(a) (1994).  A "consumer" is a buyer of any consumer product.  15 U.S.C. §2301(3) (1994).  In this case, since the express warranty was in writing, the Magnuson-Moss Warranty Act applies.

Plaintiffs argue that Chrysler violated the Act because the manifest weight of the evidence shows that (1) there was a defect in the 1991-95 model years 4.0L engine;  (2) the defect was covered under Chrysler's repair warranty;  (3) a demand for a cure was made;  and (4) Chrysler either refused or was unable to fix those engines.

Both parties to this appeal concede that the elements necessary to prove a cause of action under the UCC for breach of express warranty are, in essence, the same under the Act.  Therefore, the same reasoning that applies to plaintiffs' breach of express warranty claim under the UCC is applicable to the Magnuson-Moss Warranty Act claim as well.

Based upon the foregoing analysis, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, P.J., and HOFFMAN, J., concur.

FOOTNOTES
1:
Plaintiffs abandoned their claims with regards to the 2.5 liter engines in a subsequent amendment.

2:
Molykote is a substance used to lubricate pistons and reduce friction.

3:
Lyons testified that the usual testings that are conducted when evaluating sound, such as the jury test, annoyance scale, binaural head readings or measurements inside of the automobiles and reverberation room techniques, were never conducted by him or anyone at his company.