**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250084-U

Order filed March 30, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| ANTHONY and BETH CESARE, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiffs-Appellants/Cross-Appellees, | ) | Du Page County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-25-0084 |
| | ) | Circuit No. 22-LA-361 |
| PERMA-SEAL BASEMENT SYSTEMS, INC., | ) | |
| | ) | Honorable |
| Defendant-Appellee/Cross-Appellant. | ) | Timothy A. McJoynt |
| | ) | Maureen R. Riordan |
| | ) | Judges, presiding. |

_____

PRESIDING JUSTICE HETTEL delivered the judgment of the court.
Justices Holdridge and Anderson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: (1) The circuit court properly dismissed plaintiffs' claim for consumer fraud because plaintiffs failed to prove that defendant had engaged in a deceptive act. (2) The circuit court erred by entering judgment in favor of plaintiffs and awarding damages on their claim for breach of express warranty after the court found that defendant had fulfilled the express warranty.

¶ 2     Following a bench trial, plaintiffs, Anthony and Beth Cesare, appeal the circuit court of Du Page County's dismissal of their claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq*. (West 2006)). Defendant,

Perma-Seal Basement Systems, Inc., cross-appeals the court's judgment in favor of plaintiffs and the corresponding damages award on plaintiffs' claim for breach of express warranty. For the following reasons, we affirm in part, reverse in part, vacate in part, and remand.

¶ 3                                  I. BACKGROUND

¶ 4                              A. General Background

¶ 5        In July 2004, plaintiffs purchased a multilevel residence located at 4605 Forest Avenue in Downers Grove, Illinois (residence). The residence contained a finished basement that the previous owners had "cobbled together." The previous owners had built a platform floor over the basement floor and had installed a drop ceiling to address water seepage. The basement also had a bathroom with a shower.

¶ 6        In 2007, plaintiffs decided to refinish the basement of the residence and Anthony contacted defendant regarding its waterproofing system. On or about April 17, 2007, the parties executed a double-sided, one-page contract that provided that defendant would install a waterproofing system in the basement of the residence for a total cost of $6,047.00 (contract). The contract included a full system warranty, which was defined as a "[l]ifetime [w]arranty against any seepage onto the entire floor, for the current property owner." The contract also contained general conditions, which stated, in part, that "[plaintiffs would be] responsible for removal and replacement of personal property, improvements, fixtures or other obstacles to the work area," and that defendant would "not be responsible for damage to wall or floor coverings, landscaping, or personal property of any type due to dust, excavation, seepage, or flooding."

¶ 7        After the contract was executed, Anthony performed the demolition work on the basement of the residence that was needed to enable defendant to install its waterproofing system. While performing the work, Anthony "gutted" the basement "down to the cement floors, the cinderblock

2

walls," and an open ceiling. Thereafter, in June 2007, defendant installed its waterproofing system by digging up the concrete around the perimeter of the basement, installing drain tiles, and then recementing. Plaintiffs hired Demarco Building and Restoration (Demarco) to subsequently finish the basement by installing drywall and flooring.

¶ 8        In November 2021, around 14 years after defendant completed its work under the contract, plaintiffs observed dampness, seepage, and mold in the basement and notified defendant, who then installed a vapor barrier and drain tile at no additional cost to plaintiffs (repair work). Plaintiffs engaged Demarco to demolish the entire south wall and flooring of the basement so that defendant could perform the repair work, as well as to reconstruct the basement following the repair work. Plaintiffs separately engaged Mold Solutions to eliminate the mold in the basement.

¶ 9        Sometime after Demarco finished reconstructing the basement of the residence in March 2022, plaintiffs contacted defendant to demand that defendant "rectify the situation" and compensate them for the amounts that they had paid to Demarco and Mold Solutions to remediate the damage that the 2021 water infiltration had caused to the basement. Defendant did not respond to plaintiffs' demand or compensate them for their incurred costs.

¶ 10                                    B. Complaint

¶ 11        On April 20, 2022, plaintiffs filed a three-count complaint against defendant. Count I of the complaint asserted a cause of action for breach of express warranty. Count II asserted a separate cause of action for breach of the implied warranty of fitness for a particular purpose. Under count III, plaintiffs alleged that defendant's full system warranty, as well as its refusal to honor it, violated the Consumer Fraud Act.

¶ 12                              C. Bench Trial and Judgment

¶ 13     Beginning on December 16, 2024, a bench trial was conducted on all three counts of the complaint. During the trial, the court heard testimony from multiple witnesses, including Anthony and Roy Spencer, the president and founder of defendant.

¶ 14     Anthony testified that, during the hour or hour and a half before the contract was executed, he met with Timothy Barry, a salesperson acting on behalf of defendant. The meeting occurred at the residence, where Anthony showed Barry the basement and the two had a "long conversation." During their conversation, Anthony informed Barry that he and Beth wanted to finish the basement and that there was seepage in the floor of the basement. Anthony and Barry also discussed possible ways in which the space in the basement could be used after defendant completed its work. Anthony testified that, during this discussion, Barry had said, "[Y]ou know, you could even put a bedroom down here because you'll never get water. It's not anything you'll ever have to worry about." Subsequently, they discussed the projected costs of defendant's work on the basement. Anthony testified that he had felt "a little bit maybe taken aback" by the costs and that Barry had then stated, "I understand. This is not sexy money, okay. I get it." According to Anthony, Barry also stated, "I guarantee you if you do this work, you will never have water in this basement again."

¶ 15     Anthony further testified that Barry had "fill[ed] out" the contract during their meeting and had also explained the contract and "ma[de] sure that [he] understood that once [the] work was done, [he and Beth] would never have water in [their] basement again." Anthony also testified that he did not read the full contract before he ultimately signed it, but that he had understood the contract to promise that there would never again be seepage in the basement of the residence after defendant installed its waterproofing system.

¶ 16     Later during the trial, Spencer testified that the 2021 water infiltration in the basement of the residence did not constitute a breach of the full system warranty, but, rather, had "trigger[ed]"

4

defendant's obligation to service the waterproofing system that it had installed in the basement, according to the terms of the full system warranty. Spencer further elaborated on his understanding of the full system warranty during the following exchange at trial:

"A. ***. So I consider it a breach of warranty if [plaintiffs] called and we didn't answer the phone and said sorry, we're not going to help you. I consider that a breach of our warranty.

Q. So when it says lifetime warranty against any seepage onto the entire floor—

A. Uh-huh.

Q. –when seepage appears, you're saying that's not a breach of the warranty?

A. No.

Q. Okay.

A. Because part of the warranty, as I explained, is the terms and conditions, so. I expect people to have a problem in regards to their pump failed or they're getting new seepage or a problem with our work that they would like to call us, give us a chance to rectify it. And that's what our warranty is ***."

* * *

Q. Okay. You'd agree with me that the full system lifetime warranty is offered by [defendant] as a tool to attract new clients; correct?

A. Well, that's part of the reason. Sure.

Q. Okay. And the warranty is put in place to assure clients of waterproof protection; correct?

A. It's to assure them that if they have a problem, we'll come and fix it. So I, nor any other contractor, can guarantee you're never going to have water in your basement.

5

***. Nobody could keep water from coming into your basement. That's kind of common sense."

* * *

Q. Would it be your testimony that [defendant] could never positively warrant against water infiltration?

A. We do warrant against water infiltration. ***. And our warranty states that we'll service it at no charge. So that's our practice, that's our expectation.

So again, it would be foolish on our part to tell somebody they're never going to have water in their basement again. We don't train our sales people that. I heard it testified that Tim Barry told [plaintiffs] that. That's not the way we do business. That's not the way we train our salesmen.

* * *

Q. Okay. Isn't it true that only God can prevent seepage in your basement?

A. I think that's a fair statement."

¶ 17    Following witness testimony, the parties each submitted proposed findings of fact and conclusions of law (proposed findings). In their proposed findings, plaintiffs argued, in part, that defendant was liable under count I of the complaint for breach of express warranty because it had warranted that plaintiffs "would not experience seepage in their basement subsequent to the installation of [its] waterproofing system" but the waterproofing system had not been as warranted and had led to the 2021 water infiltration in their basement. Plaintiffs also argued that a limitation of damages clause in the contract was unconscionable. Plaintiffs cited to the Uniform Commercial Code (UCC) (810 ILCS 5/1-101 *et seq*. (West 2006)) to support their argument that defendant was liable for breach of express warranty.

6

¶ 18        During its ruling, the circuit court found with respect to count I that defendant had breached the contract by "fail[ing] to install their system in the corner area of the basement," which had caused the 2021 water infiltration in the basement. Based on this finding, the court entered judgment in favor of plaintiffs and awarded them damages in the amount of $23,181.

¶ 19        Next, the court determined that count II of the complaint had been rendered moot by the judgment and damages award under count I. Lastly, the court dismissed count III after finding that plaintiffs had failed to demonstrate that defendant had engaged in a deceptive act or practice, as well as to present evidence related to the consumer nexus test.

¶ 20        II. ANALYSIS

¶ 21        A. Standards of Review

¶ 22        Generally, our standard of review following a bench trial is whether the judgment or order entered by the circuit court is against the manifest weight of the evidence. *Granville Tower Condominium Ass'n v. Escobar*, 2022 IL App (1st) 200362, ¶ 27. A judgment is against the manifest weight of the evidence "only when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Total Staffing Solutions, Inc. v. Staffing, Inc.*, 2023 IL App (1st) 220533, ¶ 31. "Under the manifest-weight standard, we give deference to the trial court as the finder of fact, because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Archon Construction Co., Inc. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 26. Thus, as a reviewing court, we will not substitute our judgment for that of the circuit court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn therefrom. *Offord v. Fitness International, LLC*, 2015 IL App (1st) 150879, ¶ 16. Additionally, "the trial court's judgment will be affirmed provided the record contains any evidence supporting it. However, to the extent that

7

issues in a bench trial involve the *** legal effect of documents, such rulings are conclusions of law that the appellate court reviews *de novo*." *Granville Tower Condominium*, 2022 IL App (1st) 200362, ¶ 27.

¶ 23                                    B. Plaintiffs' Appeal

¶ 24        Plaintiffs argue that the court erred by dismissing their claim for violation of the Consumer Fraud Act. Specifically, plaintiffs assert that they presented sufficient evidence at trial to prove that defendant had engaged in deceptive acts in the course of trade, that defendant had intended for them to rely on its deceptive acts, and that defendant's deceptive acts proximately caused them to incur the damages that they sought to recover. Plaintiffs also assert that, because they were clearly "consumers" under the Consumer Fraud Act, they were not required to present evidence regarding the consumer nexus test.

¶ 25        In response, defendant argues that plaintiffs failed to prove that it had engaged in any deceptive act or practice. Defendant also argues, in the alternative, that plaintiffs' claim for violation of the Consumer Fraud Act is barred by the statute of limitations.

¶ 26        Section 2 of the Consumer Fraud Act states the following, in pertinent part:

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact *** in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2 (West 2006).

8

The purpose of the Consumer Fraud Act is to "protect[***] 'consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices.' " *Ash v. PSP Distribution*, LLC, 2023 IL App (1st) 220151, ¶ 23. Courts must liberally construe the statute to effectuate its purpose. 815 ILCS 505/11a (West 2006).

¶ 27    To prove a violation of the Consumer Fraud Act, a plaintiff must establish: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 625 (2008) (internal quotation omitted). In Illinois, alleged consumer fraud and breach of contract cannot " 'rest on the same factual foundation.' " *Turner v. Orthopedic & Shoulder Center, S.C.*, 2017 IL App (4th) 160552, ¶ 45 (quoting *Greenberger v. GEICO General Insurance Co.*, 631 F.3d 392, 399 (7th Cir. 2011)). Thus, " '[w]hen allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract.' " *Id.* (quoting *Greenberger*, 631 F.3d at 399). As this court has explained:

"Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action. However, it is settled that the Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy. [Citations.] We believe that a 'deceptive act or practice involves more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches

9

a contract." *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 312 (2000) (internal citation omitted).

In line with these principles, this court has found, for example, that a mere difference in understanding of certain contract language is not consumer fraud. See *Turner*, 2017 IL App (4th) 160552, ¶ 46.

¶ 28   Plaintiffs in this case argue that defendant engaged in multiple deceptive acts. Specifically, plaintiffs argue that defendant engaged in a deceptive act by providing for the full system warranty in the contract, despite knowing that the warranty constituted a "false statement." Plaintiffs appear to interpret the full system warranty as having promised that there would never again be seepage in the basement of the residence following the initial installation of defendant's waterproofing system. This being their interpretation, plaintiffs assert that the terms of the full system warranty were false in light of the fact that they were contradicted by the general conditions in the contract, and also in light of Spencer's testimony that "it would be foolish *** to tell somebody they're never going to have water in their basement again" and that "only God [could] prevent seepage in [a] basement." In turn, defendant argues that the general conditions in the contract do not contradict the terms of the full system warranty, which indeed contemplated the possibility of future seepage following the initial installation of its waterproofing system.

¶ 29   Insofar as plaintiffs assert that the full system warranty was a "false statement" contradicted by the general conditions of the contract and Spencer's testimony, their present argument bears upon their understood meaning of the warranty, which differs from that of defendant. In this way, plaintiffs' argument seems, in essence, to amount to a dressed-up, inactionable contention that they and defendant had differing understandings as to the meaning of the language of the full system warranty. See *Cook ex rel. Cook v. AAA Life Insurance Co.*, 2014 IL App (1st) 123700, ¶ 30 (ruling

10

that the parties' dispute as to the procedure for reinstating insurance coverage pursuant to the terms of written documents "constitute[d] a mere difference in opinion regarding contract interpretation insufficient to invoke the Consumer Fraud Act"). Moreover, it cannot reasonably be said that the general conditions made the full system warranty deceptive where both the terms of the warranty and general conditions were set forth in the contract itself. See 815 ILCS 505/2 (West 2006) (listing examples of deceptive conduct). This is especially so in light of the evidence at trial, which did not reflect that Barry, or any other individual affiliated with defendant, had ever actively concealed the terms of the full system warranty or general conditions, but, rather, that Anthony had simply not read the full contract before signing it. See *id*.

¶ 30　　　　We also find, based on our interpretation of the contract, that the terms of the full system warranty and general conditions do not, in fact, contradict one another. The primary objective in construing a contract is to ascertain and give effect to the intent of the parties at the time when they entered the contract. *Wolff v. Bethany North Suburban Group*, 2021 IL App (1st) 191858, ¶ 37. "To determine the intent of the parties, the court must look to the language of the instrument itself, its purpose and the surrounding circumstances of its execution and performance." *Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 45. Additionally, "[b]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Schaff v. Travelers Home & Marine Insurance Co.*, 2025 IL App (1st) 240276, ¶ 118 (internal quotation omitted).

¶ 31　　　　" 'When a dispute exists between the parties as to the meaning of a contract provision, the threshold issue is whether the contract is ambiguous.' " *Village of Palatine*, 2012 IL App (1st) 102707, ¶ 45. Contract language is not ambiguous simply because the parties do not agree on its interpretation, but, rather, when the language is susceptible to more than one meaning or is obscure

11

in meaning through indefiniteness of expression. *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 24. When contract language is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). Conversely, when contract language is unambiguous, the intent of the parties must be determined based on the plain and ordinary meaning of the contract language itself. *Storino, Ramello, & Durkin v. Rakow*, 2015 IL App (1st) 142961, ¶ 18. Courts may consult a dictionary to determine the plain and ordinary meaning of a contract term that is not defined within the contract itself. See *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 436 (2010) (stating that the court consults a dictionary to ascertain the plain and ordinary meaning of terms in an insurance policy when they are undefined).

¶ 32        The parties in this case seem to agree that the contract was confined to a double-sided page that contained both the full system warranty and general conditions. The copies of the contract that are in the record also reflect the same. Based on our independent review of the contract, we note that, on one side of the document, the full system warranty, which was defined as a "[l]ifetime [w]arranty against any seepage onto the entire floor," was enclosed within a "warranties" section that directed the reader to "see [the] reverse side for general conditions." On the other side of the document, there was indeed an enclosed section that listed the general conditions, one of which was that "[defendant would] not be responsible for damage to wall or floor coverings, landscaping, or personal property due to dust, excavation, seepage, or flooding." Within the same enclosure as the general conditions, the contract directed customers to "report any subsequent seepage" following a "repair" by defendant.

¶ 33        By its above language, the contract contemplated the possibility of seepage occurring after defendant first installed its waterproofing system, as shown by the fact that it referred to "seepage"

12

without limiting the meaning of that term to only seepage that existed at or before the time when the defendant first installed its waterproofing system. This contemplation is also shown by the fact that the contract referenced "subsequent seepage" following a "repair" made by defendant. If the contract did not, in fact, contemplate the possibility of future seepage, then there would have been no need for the contract to direct customers to take particular action upon any such "subsequent seepage" occurring.

¶ 34     In light of the plain language of the contract, we find that plaintiffs' proposed interpretation of the full system warranty as having promised that seepage would never occur following the initial installation defendant's waterproofing system was unreasonable. For similar reasons, we also find that defendant's proposed interpretation of the warranty as having promised only that it would repair its waterproofing system free of charge if future seepage or a defect in the system were to arise following the initial installation of the system was reasonable. Furthermore, because a joint reading of the terms of the full system warranty and general conditions supports the interpretation that we have adopted, we conclude that the circuit court properly determined that defendant's inclusion of both the full system warranty and general conditions in the contract did not constitute a deceptive act.

¶ 35     Next, however, plaintiffs argue that Barry's statement that they "[would] never have water in [their] basement again" was a separate deceptive act for which defendant is liable. Plaintiffs assert that they presented sufficient evidence at trial to prove that Barry had made this statement, through the testimony that was elicited from Anthony.

¶ 36     We note that the circuit court did not expressly articulate its reasons for finding that Barry's statement failed to constitute an actionable deceptive act attributable to defendant. Nevertheless, the record in this case reflects that Anthony indeed testified at trial that, leading up the execution

13

of the contract, Barry had stated to him that he and Beth "[would] never have water in their basement again" following defendant's initial installation of its waterproofing system. However, Anthony was the only testifying witness at trial who was present when Barry allegedly made this statement, which was, according to Anthony, over 17 years prior to the time of trial. Because of the passage of time between the alleged making of Barry's statement and Anthony's testimony at trial, as well as the fact that Anthony's testimony was uncorroborated by any other witnesses who were allegedly present at the time of the statement, it was not against the manifest weight of the evidence for the circuit court to determine that Barry's statement failed to prove a deceptive act attributable to defendant.

¶ 37    In light of our conclusion regarding plaintiffs' failure to prove a deceptive act, we need not consider plaintiffs' arguments regarding the rest of the elements of their claim for violation of the Consumer Fraud Act. For similar reasons, we also decline to analyze defendant's argument as to the governing statute of limitations and conclude that the circuit court properly dismissed count III of the complaint.

¶ 38                        C. Defendant's Cross-Appeal

¶ 39    Defendant's cross-appeal relates to the judgment and damages that the circuit court awarded plaintiffs on their claim for breach of express warranty. Defendant argues that plaintiffs were not entitled to judgment or damages on their claim because the evidence at trial established that defendant had performed under the express warranty at issue. Defendant further argues that plaintiffs' damages award was erroneous because all amounts that plaintiffs sought to recover were barred by the full system warranty, the court assessed the award using the incorrect legal standard, and the award was not supported by the evidence. Accordingly, defendant requests that we reduce plaintiffs' damages award to $0.

14

¶ 40    Initially, we note that, based on the record in this matter, it is unclear under which authority plaintiffs asserted their claim for breach of express warranty. In their complaint, plaintiffs did not name any particular authority. Nor did the court when it entered judgment in their favor. Additionally, although plaintiffs cited to the UCC in their proposed findings following trial, they assert now on appeal that they did not bring their claim for breach of express warranty pursuant to the UCC. Because of this lack of clarity, we will analyze the claim under both the UCC and other relevant authority, namely, the Magnuson-Moss Act (Act) (15 U.S.C. § 2301 *et seq.* (2006)). See *Clemons v. Nissan North America, Inc.*, 2013 IL App (4th) 120943, ¶ 40 (stating that "[w]ritten warranties provided with consumer goods must be examined under the requirements of both the Act and the UCC").

¶ 41                                      1. *Application of the UCC*

¶ 42    The UCC governs the sale of goods and their accompanying warranties. *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 322-23 (1999); 810 ILCS 5/2-104 (West 2006). "The test for applicability of the UCC in Illinois is whether the transaction at issue is predominantly one for the sale of goods, with services incidentally involved, or one for the rendition of services with the sale of goods incidentally involved." *Brandt v. Sarah Bush Lincoln Health Center*, 329 Ill. App. 3d 348, 352 (2002). If the transaction is primarily for the sale of goods, then the UCC applies. *Zielinski v. Miller*, 277 Ill. App. 3d 735, 742 (1995). Conversely, if the transaction is primarily for the rendition of services, then the UCC does not apply. *Brandt*, 329 Ill. App. 3d at 352.

¶ 43    "In determining whether a contract is predominantly for goods, a court will review the contractual language relating to the design, installation, or delivery of an identifiable and tangible object." *Bruel & Kjaer v. Village of Bensenville*, 2012 IL App (2d) 110500, ¶ 12. Even a contract for installation or assembly can be governed by the UCC, so long as it is predominantly for goods.

15

*Meeker v. Hamilton Grain Elevator Co.*, 110 Ill. App. 3d 668, 670 (1982). For example, in *Meeker*, the court determined that a contract for installation was predominantly for the sale of goods because the contract had used terms like "seller" and "purchaser," had charged a sales tax, and had not itemized the work of labor or installation. *Id*. at 671. In *Bob Neiner Farms, Inc. v. Hendrix*, 141 Ill. App. 3d 499, 503 (1986), the court made a similar determination based on the fact that the contract at issue had included sales tax in the total price and "was not a general construction contract encompassing site preparation and installation of services," which suggested that "the builder was primarily in the business of selling a structural product and placing it completed on a buyer's site." *Bob Neiner Farms*, 141 Ill. App. 3d at 503. Additionally, in *Bruel*, the court found that a contract for the installation of equipment was primarily for the sale of goods, partly because the contract had required the defendant "to make a single payment *** after [the] plaintiff had delivered and installed the equipment, rather than multiple payments based on time and type of services," and had contained "no breakdown in the price between the cost of the equipment and the cost of the labor ***." *Bruel*, 2012 IL App (2d) 110500, ¶ 20.

¶ 44    The contract in this case was for a mix of goods and services. On the one hand, the contract required defendant to perform the "work" of "install[ing]" a waterproofing system in the basement of the residence. The contract also stated that it was "a proposal to do a specific repair" and did not use terms like "seller" and "purchaser" or indicate a sales tax. On the other hand, however, the contract provided for numerous components to the waterproofing system, including various types of pumps, waterguard, ice guard, underground extension, and bubbler pots. Furthermore, the contract made plaintiffs, rather than defendant, responsible for "the removal and replacement of personal property, improvements, fixtures and appliances and other obstacles to the work area" whenever defendant needed to perform a necessary inspection. Additionally, the contract charged

16

plaintiffs a single price and did not itemize the costs of the parts of the waterproofing system versus the required labor. Based on these facts, we conclude that the contract was primarily for the sale of goods and that, consequently, the UCC governs any portion of the contract that related to the sale of goods. See 810 ILCS 5/2-102(2)(b) (West 2006) (providing that, "[i]n a hybrid transaction" that is primarily for the sale of goods, the UCC "applies but does not preclude application in appropriate circumstances of other law to aspects of the transaction which do not relate to the sale of goods").

¶ 45　　We must next consider whether the UCC specifically governs the full system warranty in the contract, which the parties seemingly agree is the express warranty at issue. Under section 2-313(1)(a) of the UCC, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Id*. § 5/2-313. In *Mydlach*, the supreme court explained the following regarding express warranties created under the UCC:

> "The UCC makes plain that an express warranty is related to the quality or description of the goods. [Citations.]
>
> In other words, an express warranty, for purposes of the UCC, obligates the seller to deliver goods that conform to the affirmation, promise, description, sample, or model. If a seller delivers conforming goods, the warranty is satisfied. If the seller delivers nonconforming goods, the warranty is breached at that time. Even if the buyer is unaware that the goods, as delivered, do not conform to the seller's affirmation, promise, description, sample or model, the warranty has been breached." *Mydlach*, 226 Ill. 2d at 320-21 (internal citation omitted).

17

Applying the above principles, the supreme court further found that the warranty before it was not a "UCC express warranty" because it did not relate to the quality or description of the subject goods at tender or warrant that the goods would conform to an affirmation, promise, description, sample, or model, but, rather, "promise[d] only that the manufacturer [would] repair or replace defective parts during the warranty period." *Id*. at 321.

¶ 46 Here, we earlier found, while analyzing plaintiffs' appeal, that the full system warranty in the contract did not promise that defendant's waterproofing system would always be free of defect and prevent any future seepage, but, instead, that the warranty promised that, if future seepage or a defect in defendant's waterproofing system were to arise, then defendant would repair the system free of charge. It follows from this finding that the full system warranty did not relate to the quality of the waterproofing system *at tender* and, therefore, was not an express warranty governed by the UCC. We will analyze next, then, whether the Act governs the warranty.

¶ 47 2. *Application of the Act*

¶ 48 The Act provides a federal statutory private right of action to a "consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under *** a written warranty." 15 U.S.C. § 2310(d)(1) (2006). The Act defines a "consumer" as "a buyer (other than for purposes of resale) of any consumer product" and, in turn, defines a "consumer product" as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property ***)." *Id*. § 2301(1), (3). Additionally, the Act defines a "supplier" as a "any person engaged in the business of making a consumer product directly or indirectly available to customers" and a "warrantor" as "any *** person who gives or offers to give a written warranty." *Id*. § 2301(4), (5). A consumer may bring a cause of action

18

under the Act in federal or state court to recover, as part of the judgment, reasonable costs and expenses associated with the litigation, including attorney fees. *Id*. § 2310(d)(2).

¶ 49    Although the Act does not require a consumer product to be warranted, it does subject any "written warranty" that is offered with a consumer product to the Act's regulatory scheme. *Skelton v. General Motors Corp.*, 660 F.2d 311, 314 (7th Cir. 1981); see also 15 U.S.C. § 2302(b)(2) (2006) (prohibiting the Federal Trade Commission from requiring that a consumer product or any of its parts be warranted). The Act defines a "written warranty" as:

"(A) any written affirmation or fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer that relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, or replace, or take any other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking." 15 U.S.C. § 2301(6) (2006).

¶ 50    Here, we find that defendant's waterproofing system is a "consumer product" under the Act because it was intended to be installed in the residence, that plaintiffs are "consumers" under the Act because they purchased the waterproofing system, and that defendant is both a "supplier" and a "warrantor" under the Act because it sold its waterproofing system to plaintiffs and offered the full system warranty at issue in this case. Furthermore, we find that the full system warranty in the contract is a "written warranty" under the Act because, again, as we earlier determined, the warranty was a written promise made by defendant to repair the waterproofing system that it sold to plaintiffs and later installed in the basement of the residence, whenever a defect in the system

19

or future seepage were to arise. See *Hasek v. DaimlerChrysler Corp.*, 319 Ill. App. 3d 780, 788-89, 794 (2001) (concluding that a warranty that promised in writing to "cover[***] the cost of all parts and labor needed to repair or adjust any [***] supplied item *** that prove[d] defective" was a written warranty under the Act). Thus, we conclude that the Act governs plaintiffs' present claim of breach of express warranty.

¶ 51    To prevail on a claim for breach of an express written warranty, a plaintiff must prove the following by a preponderance of the evidence:

> " 'the terms of the warranty, the failure of some warranted part, a demand upon the defendant to perform under the terms of the warranty, a failure of the defendant to do so, a compliance with the terms of the warranty by the plaintiff, and damages measured by the terms of the warranty.' " *Oggi Trattoria & Caffe, Ltd. v. Isuzu Motors America, Inc.*, 372 Ill. App. 3d 354, 360 (2007) (quoting *Hasek*, 319 Ill. App. 3d at 793).

Additionally, " '[s]ince express warranties are contractual in nature, the language of the warranty itself is what controls and dictates the obligations and rights of the various parties.' " *Id.* (quoting *Hasek*, 319 Ill. App. 3d at 788).

¶ 52    Here, defendant does not seem to dispute that plaintiffs satisfied the first three elements of their claim for breach of express warranty. Starting with the first element, the parties seem to agree as to the existence of the terms of the full system warranty in the contract. Relevant to the second element, the circuit court found that defendant had failed to extend the waterproofing system into the corner of the basement of the residence when it first installed the system, which caused the 2021 water infiltration. As to the third element, the parties stipulated at trial that plaintiffs had notified defendant of the failure of defendant's waterproofing system. Because defendant seems

to agree that these elements are satisfied, we will not disturb the circuit court's findings as to the same.

¶ 53    However, relevant to the remaining elements of plaintiffs' claim, defendant asserts that the evidence at trial demonstrated that, after plaintiffs had notified it of the 2021 water infiltration, in accordance with the terms of the full system warranty, it repaired the waterproofing system in the basement of the residence at no charge to plaintiffs for the repair work. Defendant argues that, thus, it fulfilled the terms of the full system warranty and could not have been found liable for breach of the warranty or any damages stemming therefrom.

¶ 54    Our review of the record shows that, notably, the circuit court found that defendant had, in fact, repaired the waterproofing system that it had installed in the basement of the residence, "in fulfillment of the warranty that it gave to the plaintiff[s]." Nevertheless, the court concluded that defendant was still liable to plaintiff in connection with when it had first failed to properly install the waterproofing system in 2007. The court then awarded damages resulting from this 2007 failure by defendant.

¶ 55    As the elements of the claim themselves make evident, liability for breach of an express warranty does not arise solely from the existence of a defect in a warranted good or part thereof, but rather, when the defendant also fails to repair or replace the defective good or part according to the terms of the warranty provided. See *id.* (listing the elements of a claim for breach of an express warranty and explaining that a plaintiff asserting such a claim must prove both that a defect in the product at issue caused a malfunctioning "and that the manufacturer failed to repair or replace the parts in accordance with the warranty" (internal quotation omitted)). Moreover, the circuit court provided no authority to support its award of damages under plaintiffs' claim of breach of express warranty after it had already found that defendant had fulfilled, rather than had

21

breached, the express warranty at issue. Nor are we aware of any such authority. Consequently, we reverse the court's judgment in favor of plaintiffs on count I of their complaint and vacate the corresponding damages award.

¶ 56 Because we have decided to vacate the damages award under count I, we decline to consider defendant's remaining argument that the amount in damages that the court awarded to plaintiffs was not supported by the evidence. For similar reasons, we also decline to consider plaintiffs' argument before the circuit court that the limitation of damages clause in the contract was unconscionable.

¶ 57 Lastly, we note that the circuit court dismissed count II of the complaint, for breach of implied warranty of fitness for a particular purpose, based on the fact that it had already entered judgment in favor of plaintiffs on count I of the complaint and awarded damages in connection to that judgment. However, because we have now decided to reverse the judgment and vacate the damages under count I, we also find it appropriate to vacate the dismissal of count II and remand for the court to determine whether plaintiffs are entitled to judgment on their claim for breach of implied warranty of fitness for a particular purpose.

¶ 58                                    III. CONCLUSION

¶ 59 For the foregoing reasons, we affirm the portion of the Du Page County circuit court's order dismissing count III of the complaint, reverse the portion of the order entering judgment in favor of plaintiffs on count I, vacate the portion of the order awarding plaintiffs damages under count I, vacate the portion of the order dismissing count II of the complaint, and remand for further proceedings on count II consistent with this decision.

¶ 60 Affirmed in part, reversed in part, vacated in part, and remanded.